IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| RONALD JACKSON RIGBY, ] | |
| ] | |
| Plaintiff, ] | |
| ] | CASE NO.: CV-03-HS-0637-E |
| v. ] | |
| ] | |
| SPRINGS INDUSTRIES, INC., ] | **ENTERED** |
| ] | |
| Defendant. ] | SEP - 9 2004 |

# Memorandum Opinion

This is a civil action filed by the Plaintiff, Ronald Jackson Rigby, against the Defendant Springs Industries, Inc. ("Springs") alleging one Count of Violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102. Currently pending before the Court is the Motion for Summary Judgment of the Defendant (doc. 16). The issues are whether the plaintiff is "disabled" as that term is defined under the ADA. If so, then the issue becomes whether the plaintiff is a "qualified individual" as that term is defined by the ADA.

## I. UNDISPUTED FACTS

Plaintiff Ronald Jackson Rigby is a white male born in 1959. Plaintiff has a variety of health issues including diabetes, glaucoma, arthritis, back pain, and ankle problems. However, at all times relevant to this lawsuit Plaintiff has been able to carry out the activities of daily living. More specifically, Plaintiff can get out of bed, bathe himself, dress himself, prepare his own meals, drive a car, and do his own shopping. Plaintiff can care for the children that live with him, including lifting, dressing, and playing with his smaller children. Plaintiff recently washed cars during a charity event.

In his deposition, the Plaintiff testified as follows:

Q: Any problems walking?

A: No.

Q: Can you run?

A: Yeah, for a limited distance.

Q: Do you - - Do you exercise?

A: I've got a treadmill at the house that I use.

Q: Okay. How often do you use this?

A: About three times a week.

Q: For how long?

A: About thirty minutes each time.

Q: Okay. Have any problems hearing?

A: No.

Q: Do you have any hobbies?

A: Right now I don't really have any time for any.

Q: Okay.

A: We stay pretty busy with the children that we have in the house.

Q: Okay. Are you able to care for your children?

A: Yes.

Q: Does that involve bathing them?

A: With the two youngest.

Q: Okay. Who bathes them?

A: The two-year old, his older brother bathes him. And the ten month old is usually bathed by one of the seventeen-year olds.

Q: Okay. So that's not something that you generally do?

A: I don't really generally do it. I could, but that's - - -?

Q: The little ones are how old again?

A: The youngest one is ten months old. The next one is a little over two-years old almost three.

Q: You're able to pick them up?

A: Yes.

Q: Do you dress them?

A: Yes.

Q: Do you play with them?

A: Yes.

Q: What kinds of things do you do playing with them?

A: The two-year old, he likes to play ball, play catch, ride his toys and stuff like that, you know. I get out and watch him and play catch with him and so forth. And the ten-month old, she's pretty much happy with a rattle now.

Q: Do they ride bikes?

A: Not the two younger ones.

Q: They don't?

A: No.

Q: Do you get out and ride a bike with your children?

3

> A: I don't have a bicycle to ride. I could if I wanted to.
>
> Q: Do you think you would be physically able to ride a bike?
>
> A: Yes. . . . .
>
> Q: Okay. Any other activities you engage in with your kids?
>
> A: We go to different functions. I do a lot of volunteer work at the church. I drive the bus. We had a car wash last weekend that I watched all the kids at.
>
> Q: Do you help out washing cars?
>
> A: Yeah.
>
> Q: Do you have any problem physically doing that?
>
> A: No.

Plaintiff controls his diabetes through insulin and diet. His glaucoma does not limit him; his arthritis is controlled with medication and has never prohibited him from any activity; he no longer experiences any ankle problems. Also, Plaintiff chooses not to lift heavy objects (the only example he provides is an engine block). However, Plaintiff has never been under lifting restrictions, either ordered by a doctor or self-imposed. None of Plaintiff's health issues limited him while at work.

Springs is a corporation which manufacturers and distributes linens, primarily comforters. Springs operates manufacturing facilities in the Southeastern United States, including facilities in Piedmont, Alabama. The Piedmont facilities include two structures. In each, Springs manufacturers and distributes comforters and linens. At least some of the aspects of Springs' operations require various machines and mobile equipment including large cutting machines, forklifts and power tools to be in constant operation. Accordingly, Springs's employees must be alert and careful to avoid potential injuries which could arise from for example being struck by a forklift (or other mobile

equipment) or resting one's hand where it could be injured by a cutting machine or a power tool.

In June, 2001, Plaintiff began working at Phillips' Staffing ("Phillips"). Phillips is a temp agency which provides temporary laborer employees to Springs's Piedmont facilities. Phillips Staffing does not conduct medical exams on its employees, and Plaintiff did not, while working for Phillips, provide to Springs any information about his medical history. As a Phillips employee, Plaintiff was assigned to work at Springs's Piedmont facilities. At least some of Plaintiff's duties as a temporary employee included opening and folding boxes, separating various material in bins and loading products onto shelves or trucks for distribution. Plaintiff contends that he had additional duties which included operating hand trucks and power jacks. The Plaintiff worked for Phillips for about ten months.

Springs hires some labor employees from among the temporary labor force provided by Phillips. The process works as follows: Springs, after taking into consideration the temp's length of service, their performance, and Springs's need for additional employees, selects some temps to apply for employment at Springs. After bring selected to apply, the selected temp then interviews for a specific position, usually with the supervisor for that position. If the interview is satisfactory, Springs makes an offer of employment which is contingent upon the applicant passing a medical exam. Springs then performs a post-offer pre-employment medical exam. If the examining nurse has concerns about the ability to safely perform his or her job duties the nurse can contact Springs Medical Director Dr. Richard Hughes. Dr. Hughes reviews the applicant's medical records and determines whether the applicant can safely perform the duties of the job.

Doug Scott, Springs Human Resource Representative, asked Plaintiff to fill-out an application. Plaintiff filled-out an application and subsequently had two interviews for positions at

5

Springs. Plaintiff was not selected for the first position. Plaintiff then interviewed for the second position a utility position in the cutting/receiving department. Plaintiff understood that his duties required him to operate machinery including a forklift and cutting machines. The Defendant contends, but the Plaintiff disputes, that, after the interview, Springs offered the Plaintiff employment as a utility in the cutting/receiving department. Defendant contends, and Plaintiff disputes, that the offer was made contingent upon Plaintiff passing a medical exam.

Plaintiff underwent a medical exam on March 18, 2002. The exam was performed by Carol Richmond-Stephens, a nurse on Springs's medical staff. Plaintiff provided his medical history in a form titled "Pre-placement Medical Evaluation". Plaintiff admitted that he was taking the narcotic pain killer Lortab. It is undisputed that Lortab can cause dizziness, drowsiness, reduced alertness, and decreased motor skills. [1]

Plaintiff admits that he was aware that Lortab could cause dizziness and that he read warnings for users to exercise "extreme caution" when operating machinery. Moreover, it is undisputed that Plaintiff was regularly using Lortab at the time he applied to work at Springs. Plaintiff admits that he had been taking Lortab for about a year and had a prescription to take Lortab twice daily. [2] The Defendants requested medical records from Plaintiff's medical service providers, including Dr. James McCain. Dr. McCain's records reflect that Rigby had been prescribed Lortab at least four months prior to his applying for a permanent position with Springs.

Ms. Richmond-Stephens sent documents reflecting Plaintiff's medical history to Dr. Hughes.

---

[1] Plaintiff admits that this medication can cause side affects but disputes that he ever experienced any of them.

[2] Although he had such a prescription, Plaintiff denies that he in fact took the prescription twice daily.

The Defendant contends that Dr. Hughes examined Plaintiff's medical records and determined that Plaintiff could not safely perform the duties of a utility in the cutting/receiving department. The Plaintiff disputes that Dr. Hughes made that determination. The Defendant contends that Dr. Hughes reached the aforementioned conclusion because he felt it was unsafe for Plaintiff to operate mobile equipment, such as a forklift, while under the influence of Lortab. The Plaintiff admits only that Dr. Hughes implied that it would be unsafe for Rigby to operate a forklift while taking Lortab. Dr. Hughes conveyed his determination to Ms. Richmond-Stephens.

During this period the Piedmont facilities were in a cycle of high productivity and Springs needed to fill numerous laborer positions. The Defendant contends that Mr. Scott, when told the Plaintiff could not safely perform the duties of the utility position in the cutting/receiving department, asked the medical department if there were any other labor positions that Plaintiff could safely perform. The Plaintiff disputes this assertion. The Defendant contends that Ms. Richmond-Stephens then asked Dr. Hughes if there were any other labor positions Plaintiff could safely perform. The Plaintiff disputes this assertion also. The Defendant contends that Dr. Hughes determined that Plaintiffs use of narcotic drugs made it unsafe for him to perform the duties of a laborer in the Piedmont facilities. The Plaintiff disputes this assertion stating that Dr. Hughes did not use the term "laborer" in his testimony and that that term has not been defined. It is admitted, however, that Dr. Hughes based his determination on his belief that an individual under the influence of narcotic drugs, in a manufacturing environment such as that in the Piedmont facilities, poses a direct threat to himself and to others and that he could cause injury in many ways, such as through the use of or exposure to mobile equipment or heavy machinery.

At some point thereafter Phillips' Staffing ended Plaintiff's temporary assignment.

7

Plaintiff continues to experience chronic pain. Plaintiff continues to take Lortab. In fact Plaintiff estimates that he currently takes twice as much Lortab as he did while working at Phillips.

Since separating from employment at Phillips, Plaintiff applied for a broad range of jobs including groundskeeping, housekeeping and stock room positions and he has also applied at temporary agencies. Plaintiff can perform a wide variety of physical tasks without limitation.

## II. DISCUSSION

### A.  Standard for Summary Judgment

Summary judgment is only proper if there are no genuine disputed issues of material fact, and the moving party is entitled to judgment as a matter of law." *Id.*

*Walton v. Johnson & Johnson Services, Inc.*, 347 F.3d 1272, 1279 (11th Cir. 2003).

Summary judgment is only proper where no genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If a reasonable jury could not find in favor of the nonmoving party, no genuine issue of material fact does exist; and summary judgment is proper. *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir.1994). A mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997). As Fed.R.Civ.P. 56(e) states, "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."

*Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004).

### B.  Discrimination Cases Under the ADA

The ADA prohibits discrimination by employers against <u>qualified individuals with a disability.</u> 42 U.S.C. §12112(a). To establish a prima facie case of discrimination under the ADA, a plaintiff must show: (1) he has a disability; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination because of his disability. *See, e.g., Lucas v. W.W. Grainger,*

8

*Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001); *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998). The Defendant contends first that the Plaintiff is not "disabled" as defined under the ADA. If the Court determines that the Plaintiff is disabled, then the Defendant contends that the Plaintiff is not a "qualified individual" as defined under the ADA.

**C.      The Plaintiff Is Not Disabled Under the ADA**

The ADA defines "disability" as: A) a physical or mental impairment that <u>substantially limits</u> one or more of the major life activities of an individual; B) a record of such an impairment; or C) being regarded as having such an impairment. *Sutton v. United Air Lines*, 527 U.S. 471, 478 (1999) (quoting 42 U.S.C. § 12101(2)). The Defendant contends that the Plaintiff cannot meet the criteria of either sections A or C. Subsection B is not a ground for Plaintiff's disability.

**1.      The Plaintiff Does Not Have a Physical or Mental Impairment That Substantially Limits One or More of His Major Life Activities**

The term "substantially limits" is defined as "[u]nable to perform a major life activity that the average person in the general population can perform" or "significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 195-196 (2002) (quoting 29 C.F.R. §§ 1630.2(j)(2001)).

The plaintiff argues that his diabetes "has substantially limited him in the major life activity of working." Regarding the major life activity of working, the term "substantially limits" is defined as

> significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable

9

training, skills and abilities. <u>The inability to perform a single particular job does not constitute a substantial limitation in the major life activity of "working."</u>

29 C.F.R. §1630.2(j)(3)(I) (emphasis added). The Plaintiff states that the "broad class of jobs that Rigby is unable to work because of his impairment are those commercial driving positions that require a CDL." The Plaintiff argues that once he became insulin dependent, he lost his CDL and is now unable to perform classes of jobs which require such a license.

In *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1327 (11th Cir. 1998), the Eleventh Circuit held:

> Under the ADA, a physical impairment does not substantially limit the major life activity of working merely because it precludes the performance of one particular job. 29 C.F.R. § 1630.2(j)(3)(I). Instead, the impairment must significantly restrict "the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Id.*

*Standard,* 161 F.3d 1318, at 1327 (11th Cir. 1998).

> EEOC regulations also give guidance for determining whether an individual is substantially limited in the major life activity of "working." The ability to work is substantially limited (among other indicia) if the plaintiff is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes *as compared to the average person having comparable training, skills and abilities."* 29 C.F.R. § 1630.2(j)(3)(I) (emphasis added). Thus, whether a plaintiff is substantially limited in the major life activity of working is determined by comparing his ability to perform jobs with the ability of a person without physical limitations who has comparable education, job skills, and talent. But the regulations also make clear that "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.*

\* \* \*

> The regulations further instruct that a court may consider: the geographical area to which the individual has reasonable access, the job from which the individual has been disqualified because of an impairment, and the number and types of jobs using and not using similar training, knowledge, skills, or abilities, within that geographical area, from which the individual is also disqualified because of the

impairment. *See* 29 C.F.R. § 1630.2(j)(3)(ii). The Supreme Court explains:

> To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's *skills* (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.
>
> *Sutton v. United Airlines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 2151, 144 L.Ed.2d 450 (1999) (further noting that the court "should" consider these factors, in contrast to the regulation's instruction that these factors "may" be considered) (emphasis added).

*Mullins v. Crowell,* 228 F.3d 1305, 1314 (11th Cir. 2000).

In interpreting the Supreme Court's statements, a number of circuits have held that the ADA "requires a plaintiff . . . to produce some evidence of the number and types of jobs in the local employment market to show that he is disqualified from a substantial class or broad range of such jobs." *Duncan v. Washington Metro Transit Authority*, 240 F.3d 1110, 1115-1116 (D.C. Cir. 2001).

The *Duncan* Court went on to note that

> The approach we adopt is consistent with most other circuits'. *See Santiago Clemente v. Executive Airlines, Inc.,* 213 F.3d 25, 32-33 (1st Cir.2000) (concluding former flight attendant failed to show temporary hearing loss was disability under ADA because she offered "no evidence of how many jobs call for this ability, or that she was precluded from any class of jobs"); *Webb v. Clyde L. Choate Mental Health & Dev. Ctr.,* 230 F.3d 991, 997 (7th Cir.2000) (upholding summary judgment against psychologist suffering from severe asthma, osteoporosis, and a weakened immune system because he "ha[d] not presented evidence that his condition prevents him from performing a class of jobs"); *Taylor v. Nimock's Oil Co.,* 214 F.3d 957, 961 (8th Cir.2000) (concluding former cashier with 40 hour week and 10 pound carry limit did not establish disability because she "presented no evidence to create a genuine issue of material fact about whether she could perform a class of jobs with her restrictions") (citing *Berg v. Norand Corp.,* 169 F.3d 1140, 1145 (8th Cir.1999); *Helfter v. United Parcel Serv., Inc.,* 115 F.3d 613, 617-18 (8th Cir.1997)); *Colwell v. Suffolk County Police Dep't,* 158 F.3d 635, 645 (2d Cir.1998) ("Without specific evidence about 'the kinds of jobs from which [an] impaired individual is disqualified,' the jury could not perform the careful analysis that is necessary to determine that [a

plaintiff] was substantially limited in his ability to work.") (quoting *Heilweil v. Mount Sinai Hosp.,* 32 F.3d 718, 723 (2d Cir.1994)); *Snow v. Ridgeview Med. Ctr.,* 128 F.3d 1201, 1207 (8th Cir.1997) (holding "general lifting restriction imposed by a physician, without more, is insufficient to constitute a disability within the meaning of the ADA" with regard to major life activity of working); *see also Williams v. Channel Master Satellite Sys., Inc.,* 101 F.3d 346, 349 (4th Cir.1996) ("hold [ing], as a matter of law, that a twenty-five pound lifting limitation-- particularly when compared to an average person's abilities--does not constitute a significant restriction on one's ability to lift, work, or perform any other major life activity"); *Ray v. Glidden Co.,* 85 F.3d 227, 229 (5th Cir.1996) ("[I]nability to perform heavy lifting does not render a person substantially limited in the major activities of lifting or working."); *McKay v. Toyota Motor Mfg., U.S.A., Inc.,* 110 F.3d 369, 373 (6th Cir.1997) (holding woman with carpal tunnel syndrome and 20-pound lifting not disabled because "at best, her evidence supports a conclusion that her impairment disqualifies her from only the narrow range of assembly line manufacturing jobs that require repetitive motion or frequent lifting of more than ten pounds"). *But see Wellington v. Lyon County Sch. Dist.,* 187 F.3d 1150, 1155 (9th Cir.1999) (holding evidence that impairment disqualified plaintiff from "metal fabrication, welding, ... heavy activities, carpentry, ... the use of a variety of tools to do maintenance and repairs, et cetera" coupled with his anecdotal testimony he had to quit one plumbing job because he was "in too much pain to even continue" raised triable issue of fact on disability); *cf. Burns v. Coca-Cola Enters., Inc.,* 222 F.3d 247 (6th Cir.2000) (upholding determination plaintiff was disabled because of district court's finding impairment "precluded him from performing at least 50% of the jobs that he was qualified to perform given his educational background and experience" where finding was apparently based solely on 23-pound lifting limit and limited education and work experience); *Mullins v. Crowell,* 228 F.3d 1305, 1314 n. 18 (11th Cir.2000) ("[E]xpert vocational evidence, although instructive, is not necessary to establish that a person is substantially limited in the major life activity of working. Furthermore, a plaintiff could testify from his or her own extensive job search whether other jobs that he or she could perform were available in the geographical area.").

*Duncan v. Washington Metropolitan Area Transit Authority,* 240 F.3d 1110, 1116-1117, 345 U.S.App.D.C. 170,176 - 177 (D.C. Cir. 2001).

The Plaintiff presents no evidence about jobs in the relevant job market and his ability to perform same. Plaintiff presents no evidence that, in the absence of a CDL, he is precluded from a "broad range" or "substantial class" of jobs in the relevant geographical area. Plaintiff presents no evidence from a vocational expert, no statistics about jobs available in the area, no evidence about

his education or vocational training, no evidence about the geographic region to which he has access, and no evidence about the number of jobs requiring similar training from which he is disqualified because of his impairment. Plaintiff's employment history indicates that he is qualified to work as a driver or as a manual laborer. However, Plaintiff presents no evidence about whether there are truck driver positions available that do not require a CDL, or about the number and kinds of manual laborer positions that are available in the relevant market, or his success in obtained same. The undisputed evidence shows that plaintiff has in fact applied for a number of manual laborer positions.

The evidence is clear that the Plaintiff does not have a physical or mental impairment that substantially limits one or more of his major life activities.

### 2. There Is No Evidence That the Plaintiff Was Perceived As Being Disabled

Plaintiff argues that Springs perceived him as being disabled because of his Lortab use. Again, to succeed on this claim, the employer must have regarded him as not being able to perform the job in question, and also that he could not perform a "broad range" or "substantial class" of jobs which would otherwise be available to him in the local job market.

The Plaintiff bases his entire argument on this point on the evidence of Dr. Hughes' decisions. He argues that Dr. Hughes effectively eliminated an entire class, or a broad range of jobs because he determined that the Plaintiff could not work in a "manufacturing area" and therefore could work no jobs in the Piedmont plant.

The Plaintiff's pre-placement medical evaluation, taken March 18, 2002, shows that the Plaintiff indicated that he was taking prescribed medication at the time. *Pre-placement Medical Evaluation*, at 1. The medical history taken by Nurse Carol Richmond-Stephens reflects that the

Plaintiff informed her of a prescription for 7.5 mg tablets of Lortab to be taken twice a day, and that he had been taking the medication for at least four months. *Id.* at 2. It is undisputed that Lortab is a narcotic and that it can cause dizziness, drowsiness, reduced alertness, and decreased motor skills.

In Dr. Hughes's deposition, he testified that he first became involved with Mr. Rigby after Nurse Richmond-Stephens contacted him. *Deposition of Hughes*, at 42. Dr. Hughes stated that he specifically requested Mr. Rigby's medical records so that he could review them. *Id.* Dr. Hughes stated that the nurse told him that the job Mr. Rigby was applying for was a "mobile truck driver" (forklift operator). *Id.* at 43-44. He later testified that he was told that Mr. Rigby was applying for a position that had a number of duties, and that one of those duties was that of a forklift operator. *Id.* at 57. Dr. Hughes testified that after he received Mr. Rigby's medical records he determined that Mr. Rigby did not meet the criteria "for that particular job at that particular time." *Id.* at 48. He stated that the main reason he did not meet the criteria for that job was that he was on the Lortab medication. *Id.* at 49, 55. He stated that he determined that the medication would reduce his alertness and/or would pose a safety risk. *Id.* at 51. He called 7.5 milligrams a "moderately high dose" of the medication. *Id.* at 52. Based on the medical information Dr. Hughes had, he testified that because the Plaintiff had a prescription for Lortab twice a day, and that you are supposed to take it at 12 hour intervals, it would be very likely that he would be under the influence of the medication while at work. *Id.* at 59-60.

Dr. Hughes went on to say that even if the job did not require the driving of a forklift that he would not have approved him for it because he would have been working in the "manufacturing area" of the plant. *Id.* at 57-58, 62-63, 79, 83, 90-93, 97, 98. He states

[t]he reason being is . . . is that he could be sedated, he could be dizzy, drowsy, he

14

> could walk out in front of a [forklift] and he could get hit. He could put his hand in a machine unknowingly, because he was under the influence of a narcotic medication.
>
> I can't off the top of my head think of a thing in – a job in Piedmont in manufacturing that I would – that I would have allowed him to go to on that medication.

*Id.* at 57-58.

However, Dr. Hughes also testified that there were a number of jobs that existed at the plant which the Plaintiff could do, if they were in areas other than a manufacturing environment. *Id.* at 63. For example, Dr. Hughes stated that he could safety operate hand trucks and pallet jacks. *Id.* at 63-64. He stated that after he told the company that Mr. Rigby did not qualify for the position, he was contacted by Nurse Richmond-Stephens and the following exchange took place:

> She said, Do you think there's any job he could do? And I said, Carol, there's plenty of jobs he can do, but I said that I can't imagine a job in Piedmont that he could do in manufacturing that I would feel comfortable with him doing.

*Id.* at 79. He also testified that there were many jobs at Springs outside of the manufacturing area that Rigby could do including office jobs, computer programming and work, and other jobs that don't require him to be in the manufacturing area. *Id.* at 84-85.

Dr. Hughes did not eliminate an entire class or broad range of jobs. He was satisfied that there were plenty of jobs the Plaintiff could do. He did not perceive the Plaintiff as being disabled from these positions, only these positions that existed in manufacturing areas. Even Plaintiff, in the undisputed facts, admits that Dr. Hughes based his determination on his belief that an individual under the influence of narcotic drugs, in a manufacturing environment such as that in the Piedmont facility, poses a direct threat to himself and to others and that he could cause injury in many ways, such as through the use or exposure to mobile equipment or heavy machinery. There is no evidence

15

that Dr. Hughes, or Springs, perceived of the Plaintiff as being disabled.

Accordingly, there is no evidence that Plaintiff was perceived as being disabled.

### III. CONCLUSION

The plaintiff is not disabled under the ADA. Based on this holding, it is unnecessary to determine whether plaintiff is a "qualified individual" as that term is defined by the ADA. The Motion for Summary Judgment is therefor due to be **GRANTED**. A separate Order will be entered.

Done this 9 day of September, 2004.

VIRGINIA EMERSON HOPKINS
UNITED STATES DISTRICT JUDGE