# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# EASTERN DIVISION

| | |
|---|---|
| **RONALD JACKSON RIGBY,** | ] |
| | ] |
| **Plaintiff,** | ] |
| | ] |
| | ]**CASE NO.: 1:03-CV-0637-VEH** |
| v. | ] |
| | ] |
| **SPRINGS INDUSTRIES, INC.,** | ] |
| | ] |
| **Defendant.** | ] |

## Memorandum Opinion and Order

This is a civil action filed by the Plaintiff, Ronald Jackson Rigby, against the Defendant Springs Industries, Inc. ("Springs") alleging one Count of Violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102. Currently pending before the Court is the Motion for Summary Judgment of the Defendant (doc. 16) on the grounds that Plaintiff is neither "disabled" or a "qualified individual" under the ADA. Plaintiff contends that Defendant discriminated against him by refusing to hire him following disclosure of a prescription for the pain medication Lortab on a pre-hire medical questionnaire. For the reasons stated herein, Defendant's Motion is due to be **DENIED**.

## I. BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Ronald Jackson Rigby brought an action alleging that Defendant Springs violated the ADA, 42 U.S.C. §12102, by refusing to hire Plaintiff because of his prescription for Lortab. The district court (Hopkins, V.), granted Springs's motion for summary judgment, maintaining that Rigby was neither disabled nor "regarded as disabled" under the ADA. Rigby appealed.

On November 16, 2005, in unpublished opinion No. 044-15121, the Eleventh Court of Appeals affirmed the district court's grant of summary judgment as to Rigby's 42 U.S.C. § 12102(2)(A) actual disability theory, and reversed and remanded the district court's grant of summary judgment as to Rigby's § 1210 2(2)(C) regarded as disabled theory. This court now addresses that theory.

## II. FACTS[1]

Springs is a corporation that manufacturers and distributes linens, primarily comforters. Springs operates manufacturing facilities in the Southeastern United States, including facilities in Piedmont, Alabama. The Piedmont facilities include two structures. In each, Springs manufactures and distributes comforters and linens. At least some of the aspects of Springs' operations require various machines and

---

[1]Unless otherwise noted, the facts are undisputed. Whenever facts are disputed this court has, as it must, construed them in the light most favorable to the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

mobile equipment, including large cutting machines, forklifts and power tools, to be in constant operation.

In June, 2001, Rigby began working at Phillips' Staffing ("Phillips"). Phillips is a temp agency which provides temporary laborer employees to Springs's Piedmont facilities. Phillips does not conduct medical exams on its employees, and Rigby did not, while working for Phillips, have to provide Springs with any information about his medical history. As a Phillips employee, Rigby was assigned to work at Springs's Piedmont facilities. At least some of Rigby's duties as a temporary employee included opening and folding boxes, separating various material in bins and loading products onto shelves, or onto trucks for distribution. Rigby contends that he had additional duties which included operating hand trucks and power jacks. Rigby worked for Phillips for about ten months.

Springs hires some labor employees from among the temporary labor force provided by Phillips. The process works as follows: Springs, after taking into consideration the temp's length of service, their performance, and Springs's need for additional employees, selects some temps to apply for employment at Springs. After being selected to apply, the selected temp then interviews for a specific position, usually with the supervisor for that position. If the interview is satisfactory, Springs makes an offer of employment which is contingent upon the applicant passing a

medical exam. Springs then performs a post-offer pre-employment medical exam. If the examining nurse has concerns about the prospective employee's ability to safely perform his or her job duties, the nurse can contact Springs' Medical Director, Dr. Richard Hughes. Dr. Hughes reviews the applicant's medical records and determines whether the applicant can safely perform the duties of the job.

Doug Scott, Springs' Human Resource Representative, asked Rigby to fill out an application. Rigby filled out an application and subsequently had two interviews for positions at Springs. Rigby was not selected for the first position. Rigby then interviewed for the second position, a utility position in the cutting/receiving department. Rigby understood that his duties required him to operate machinery, including a forklift and cutting machines. Springs contends, but Rigby disputes, that, after the interview, Springs offered Rigby employment as a utility in the cutting/receiving department. Springs contends, and Rigby disputes, that the offer was made contingent upon Rigby's passing a medical exam.

Rigby underwent a medical exam on March 18, 2002. The exam was performed by Carol Richmond-Stephens, a nurse on Springs's medical staff. Rigby provided his medical history in a form titled "Pre-placement Medical Evaluation". Rigby admitted that he was taking the narcotic pain killer Lortab. It is undisputed that Lortab can cause dizziness, drowsiness, reduced alertness, and decreased motor

4

skills. [2]

Rigby admits that he was aware that Lortab could cause dizziness and that he read warnings for users to exercise "extreme caution" when operating machinery. Moreover, it is undisputed that Rigby was regularly using Lortab at the time he applied to work at Springs. Rigby admits that he had been taking Lortab for about a year and had a prescription to take Lortab twice daily. [3] Springs requested medical records from Rigby's medical service providers, including Dr. James McCain. Dr. McCain's records reflect that Rigby had been prescribed Lortab at least four months prior to his applying for a permanent position with Springs.

Ms. Richmond-Stephens sent documents reflecting Rigby's medical history to Dr. Hughes. Springs contends that Dr. Hughes examined Rigby's medical records and determined that Rigby could not safely perform the duties of a utility in the cutting/receiving department. Rigby disputes that Dr. Hughes made that determination. Springs contends that Dr. Hughes reached the aforementioned conclusion because he felt it was unsafe for Rigby to operate mobile equipment, such as a forklift, while under the influence of Lortab. Rigby admits only that Dr. Hughes

---

[2] Rigby admits that this medication can cause side affects but disputes that he ever experienced any of them.

[3] Although he had such a prescription, Rigby denies that he in fact took the prescription twice daily.

implied that it would be unsafe for Rigby to operate a forklift while taking Lortab. Dr. Hughes conveyed his determination to Ms. Richmond-Stephens.

During this period, the Piedmont facilities were in a cycle of high productivity and Springs needed to fill numerous laborer positions. Springs contends that Mr. Scott, when told Rigby could not safely perform the duties of the utility position in the cutting/receiving department, asked the medical department if there were any other labor positions that Rigby could safely perform. Rigby disputes this assertion. Springs contends that Ms. Richmond-Stephens then asked Dr. Hughes if there were any other labor positions Rigby could safely perform. Rigby disputes this assertion also. Springs contends that Dr. Hughes determined that Rigby's use of narcotic drugs made it unsafe for him to perform the duties of a laborer in the Piedmont facilities. Rigby disputes this assertion, stating that Dr. Hughes did not use the term "laborer" in his testimony and that that term has not been defined. It is admitted, however, that Dr. Hughes based his determination on his belief that an individual under the influence of narcotic drugs, in a manufacturing environment such as that in the Piedmont facilities, poses a direct threat to himself and to others and that he could cause injury in many ways, such as through the use of or exposure to mobile equipment or heavy machinery. At some point thereafter, Phillips ended Rigby's temporary assignment.

Rigby continues to experience chronic pain. Rigby continues to take Lortab. In fact, Rigby estimates that he currently takes twice as much Lortab as he did while working at Phillips.

Since separating from employment at Phillips, Rigby has applied for a broad range of jobs including groundskeeping, housekeeping and stock room positions and he has also applied at temporary agencies. Rigby can perform a wide variety of physical tasks without limitation.

### III. DISCUSSION

**A.     Standard for Summary Judgment**

> Summary judgment is only proper if there are no genuine disputed issues of material fact, and the moving party is entitled to judgment as a matter of law." *Id.*

*Walton v. Johnson & Johnson Services, Inc.*, 347 F.3d 1272, 1279 (11th Cir. 2003).

> Summary judgment is only proper where no genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If a reasonable jury could not find in favor of the nonmoving party, no genuine issue of material fact does exist; and summary judgment is proper. *Beal v. Paramount Pictures Corp.,* 20 F.3d 454, 459 (11th Cir.1994). A mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment. *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997). As Fed.R.Civ.P. 56(e) states, "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits

or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."

*Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004)**.**

**B.     Discrimination Cases Under the ADA**

The ADA prohibits discrimination by employers against <u>qualified individuals with a disability.</u>  42 U.S.C. §12112(a) (emphasis supplied).  To establish a prima facie case of discrimination under the ADA, a plaintiff must show: (1) he has a disability; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination because of his disability.  *See, e.g.*, *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001); *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998).  The Defendant contends first that the Plaintiff is not "disabled" as defined under the ADA. However, if the Court determines that the Plaintiff is disabled, then the Defendant contends that the Plaintiff is not a "qualified individual" as defined under the ADA.

**C.  The Plaintiff Has a Disability Under the ADA**

The ADA defines "disability" as: A) a physical or mental impairment that <u>substantially limits</u> one or more of the major life activities of an individual; B) a record of such an impairment; <u>or</u> C) being regarded as having such an impairment. *Sutton v. United Air Lines*, 527 U.S. 471, 478 (1999) (quoting 42 U.S.C. § 12101(2))

(emphasis supplied). The Eleventh Circuit remanded this case to this court to determine whether Rigby is "regarded as disabled." It is undisputed that Rigby does not have a record of such impairment. Thus, the sole question for this court is whether Rigby was "regarded as disabled."

> **The Eleventh Circuit Affirmed this court's prior order that Plaintiff Does Not Have a Physical or Mental Impairment That Substantially Limits One or More of His Major Life Activities.**

In order to be considered "regarded as disabled," Rigby must establish that Springs regarded him as not only unable to perform the job in question, but also as unable to perform a broad range or class of jobs. *Sutton v. United Airlines*, U.S. 471, 478 (1999).

Dr. Hughes asserted that there was no manufacturing job at Springs in which he would feel comfortable allowing Rigby to work due to his Lortab use, which can induce dizziness and drowsiness. "I can't off the top of my head think of a thing in – a job in Piedmont in manufacturing that I would – that I would have allowed him to go to on that medication." *Deposition of Hughes*, 57-58. Dr. Hughes also testified that there were a number of jobs that existed at the plant which Rigby could do, if they were in areas other than a manufacturing environment. He stated that after he told the company that Rigby did not qualify for the position, he was contacted by Nurse Richmond-Stephens and the following exchange took place:

> She said, Do you think there's any job he could do? And I said, Carol, there's plenty of jobs he can do, but I said that I can't imagine a job in Piedmont that he could do in manufacturing that I would feel comfortable with him doing.

*Id.* at 79. He also testified that there were many jobs at Springs outside of the manufacturing area that Rigby could do, including office jobs, computer programming and work, and other jobs that do not require him to be in the manufacturing area. *Id.* at 84-85.

This court originally held that there was no evidence that Rigby was perceived as disabled, and thus granted Springs's motion for summary judgment. The judgment was grounded in the premise that manufacturing is not a class or broad range of jobs. However, a case decided by the Eleventh Circuit after the judgment was rendered in this court establishes that manufacturing *is* in fact a class of jobs or a broad range of jobs for disability purposes. *D'Angelo v. Conagra Foods*, 422 F.3d 1220 (11th Cir 2005). As a result, because Rigby was perceived by Dr. Hughes as unable to perform any job in manufacturing, and thus a broad range or class of jobs, evidence does exist that Rigby was perceived as disabled, as set forth in the ADA.

**D. A Reasonable Jury Could Find That the Plaintiff Is A Qualified Individual Under the ADA.**

In order to establish a prima facie case of discrimination under the ADA, a person must also demonstrate that he is a qualified individual. According to the

ADA, a qualified individual is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such an individual holds or desires." 42 U.S.C.A. §12111.  The ADA contains a direct threat exception, which provides that a person is not a qualified individual if his disability "poses a direct threat to the health or safety of others." 42 U.S.C. §12111(3).  A direct threat  is defined as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation."  See *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1280 (11th Cir. 2001).

There is a dispute among circuits over which party bears the burden of proof as to whether a potential employee constitutes a direct threat to himself or others. *Branham v. Snow*, 392 F.3d 896, 907 (7th Cir. 2004).  Certain circuits, viewing "direct threat" as an affirmative defense,  place the burden on the employer to prove an employee or potential employee posed a direct threat to himself or others.  *Id.* at 907, citing *EEOC v. Chrysler Corp.*, 917 F. Supp. 1164, 1171 (E.D.Mich. 1996).  Other circuits, including the Eleventh Circuit, place the burden at all times upon the plaintiff to prove that he did not constitute a direct threat.  *Id.* at 907, citing *Moses v.*

*American Nonwovens, Inc*. 97 F.3d 446, 447 (11th Cir. 1996)(per curium).[4]  "The employee retains at all times the burden of persuading the jury that either he was not a direct threat or that reasonable accommodations were available." *LaChance*, 146 F.3d 832, 836.  If he is unable to do so, he is not a qualified individual and cannot establish a prima facie case of discrimination.  *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1280 (11th Cir. 2001), *citing LaChance v. Duffy's Draft House*, 146 F.3d 832, 836 (11th Cir. 1998).

Springs does not argue that Rigby was incapable of performing the essential functions of the position; rather, Springs contends that Rigby constituted a direct threat because his use of Lortab would endanger himself and others in the manufacturing environment of Springs's Piedmont facilities.  The issue to be considered, therefore, is whether Rigby presents evidence from which a reasonable jury could conclude he was not a direct threat to himself or others, or that reasonable accommodations would have eliminated the direct threat.

"The direct threat defense must 'be based on reasonable medical judgment that

---

[4] The different approaches may be justified by the actual language of the ADA.  The statute discusses "direct threat" in a section entitled "Defenses", which leads to the interpretation that the employer carries the burden to prove direct threat.  However, the statute also labels the direct threat analysis a "qualification standard", thus inviting the interpretation that the plaintiff bears the burden of proving he is not a direct threat as part of the burden of proving he is "qualified".  *Branham v. Snow*, 392 F.3d 896, 907 (7th Cir. 2004), citing Gillum, Jon L., *Tort Law and the Americans with Disabilities Act: Assessing the Need for a Realignment*, 39 Idaho L.Rev. 531, 539, 565-67(2003).

relies on the most current medical knowledge and/or the best available objective evidence' and upon an expressly 'individualized assessment of the individual's present ability to safely perform the essential functions of the job." *Chevron USA, Inc. v. Echazabal*, 122 S.Ct. 2045 at 2053 (9th Cir. 2000) (quoting 29 C.F.R.§1630.2(r)). There are four factors an employer must consider in determining that someone is a direct threat: 1) the duration of the risk; 2) the nature and severity of the potential harm; 3) the likelihood that the potential harm will occur; and 4) the imminence of potential harm. 29 C.F.R. §1630.2(r). "To prevent the very reliance on stereotype and related perceptions of an individual's limitations that the ADA prohibits, an employer must point to particularized facts about the specific person's condition to support its decision." *Lowe v. Alabama Power Co.*, 244 F.3d 1305, 1308 (11th Cir. 2001) (emphasis added).

>   1. **A Genuine Issue of Material Fact Exists As To Whether Plaintiff Posed a Direct Threat to the Safety of Himself and Others, As He Worked in the Piedmont Facility Without Incident for Several Months While Taking Lortab.**

Rigby offers the fact that Springs initially offered him a job after approximately ten months of contracting at Springs (for at least four of which he had a Lortab prescription) as proof that Springs had not observed any side effects of the Lortab affecting his performance. There are no records of complaints or accidents involving

Rigby for the time period prior to his pre-employment medical exam.

Beyond that, Rigby asserts that, although his Lortab prescription was for twice-per-day doses, he only took it three to four times per week, and usually at night. He further asserts that Lortab actually had a stimulating effect on him. Rigby does not present any medical experts to confirm his assertions, nor to confirm that the manner in which he claims to have been taking his medicine would have allowed him to perform the job safely. Rigby proffers no evidence that any other employee at Springs performed safely the utility job in question, or any other job at the Piedmont facility, while prescribed Lortab.

Springs presented evidence in the form of printouts from the website WebMD and *Mosby's Nursing Drug Reference* of the possible side effects of Lortab, which Rigby does not dispute. Springs based its decision not to hire Rigby on the fact that Rigby was prescribed Lortab twice per day, as he disclosed in his pre-placement medical evaluation forms. Springs's evidence describes the possible side effects of Lortab, including severe weakness or dizziness, lightheadedness, tiredness, confusion, euphoria, dysphoria, disorientation, hallucination, and convulsions, among others. Dr. Hughes also referenced his knowledge of drug schedules in his deposition, and the fact that Lortab is a Schedule 3 narcotic. No evidence, be it statistics or otherwise, was presented regarding the likelihood of someone suffering

the cited effects while taking Lortab.  Springs presented evidence of the dangers inherent in the Springs manufacturing environment with proof of injuries that occur there on a fairly regular basis to people not taking prescription drugs, even to those who spend little time around mobile equipment and machinery.  Springs's only medical experts were Dr. Hughes and Nurse Richmond-Stevens, both employees of Springs.

Rigby does not contest that, or present evidence that Springs's sources are not "current medical knowledge."  Rigby does not dispute the possible side effects of Lortab; rather, he asserts that he himself does not suffer from those side effects that concern Dr. Hughes; in other words, Springs' failure to provide an <u>individualized</u> assessment resulted in a discriminatory failure to hire.  Although he provides no expert testimony to corroborate his assertion, Rigby relies heavily on the fact that he had no on-the-job incidents in his eight months as a contractor at the Piedmont facility as evidence of his lack of negative side effects.  It is Springs's decision that Rigby constituted a direct threat because of the possible side effects of Lortab generally, rather than Rigby's actual experience taking the Lortab, with which Rigby takes issue.

Both parties cite *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir 1998), in which a kitchen worker with epilepsy was discharged because he

had seizures on the job which caused him to become dazed and disoriented.  Because of such seizures, the plaintiff was considered to be a danger to himself and others in an environment which included a flat top grill and hot pans of grease. The plaintiff's evidence that he had been able to perform his job safely at other places of employment was insufficient because his prior jobs consisted mainly of prep work, and there was no evidence he used the same kind of equipment he would have been required to use in the position at issue.  Even more to the point, evidence that he worked safely in a restaurant around similar equipment for 13 months following his dismissal was insufficient to overcome the plaintiff's own admission, as well as his doctor's statement, that he posed a risk of harm.  He had never gone more than two weeks without a seizure since childhood, and had seizures while working at the defendant's restaurant.

Rigby, however, worked without incident for approximately eight months in the Piedmont facility itself, the same environment in which Springs contends Rigby constitutes a direct threat to himself and others.  Unlike *LaChance*, there is no admission by Rigby that he posed a risk, nor is there a personal physician's statement to that effect.  There is no evidence that Rigby experienced any of the side effects that Lortab can cause, whereas in *LaChance* the plaintiff admittedly had frequent seizures and had experienced them while on the job at the defendant's restaurant.

While Rigby does not present an overwhelming amount of evidence tending to show that he would not have constituted a direct threat to himself or others in the Springs Piedmont facility, he does present evidence from which a jury might find that he did not constitute a direct threat to the safety of himself and others, and therefore may be a qualified individual under the ADA. A jury could reasonably decide that, because Rigby worked in the Piedmont facility for approximately eight months as a contract worker, apparently safely enough to be offered a permanent position at the facility, he did not constitute a direct threat to himself or others, without accommodation.

### III. CONCLUSION

Rigby is "regarded as disabled" under the ADA. There is a genuine issue of material fact as to whether Rigby is a "qualified individual" under the ADA because he would not constitute a "direct threat" to the safety of himself and others. The motion for summary judgment is **DENIED**.

**DONE** and **ORDERED** this 5th day of May, 2006.

**VIRGINIA EMERSON HOPKINS**
United States District Judge